Freddie TYGART *v.* Charles Wayne KOHLER

CA 02-821                                                  109 S.W.3d 147

Court of Appeals of Arkansas
Divisions III and IV
Opinion delivered June 4, 2003

*Barham Law Office, P.A.,* by: *R. Kevin Barham,* for appellant.

*Hixon & Cleveland Law Office,* by: *Herschel W. Cleveland,* for appellee.

R OBERT J. GLADWIN, Judge. Appellee, Charles Kohler, brought this civil action in the circuit court, asking for damages against appellant, Freddie Tygart, for assault and battery committed when appellant attacked him with a baseball bat. Although appellant alleged self defense, the trial court found him to be the aggressor in the situation and awarded damages to appellee for medical bills and for pain and suffering. For reversal, appellant contends that the trial court erred in its application of the doctrine of self defense and in its calculation of damages. We affirm.

On December 5, 1999, an altercation occurred between the parties, who had been involved with the same woman for some time. Tammy Lucas was appellee's former common-law wife in another state and had three children with him. Both men testified that Ms. Lucas had lived with each of them off and on; one characterized her as a "floater," and the other described their relationship as "seasonal." At the time of the altercation, Ms. Lucas was not living with either of the parties, but, according to appellant, was presently in a relationship with him.

Appellant testified that he was supposed to meet Ms. Lucas at the Spanish American Restaurant. When he arrived about thirty to forty-five minutes late, he noticed appellee's vehicle at the restaurant. Appellant left, but returned sometime later. Upon his

return, he saw appellee leaning through the window of the truck appellant had loaned to Ms. Lucas. Appellant said appellee's head and shoulders were inside the truck. Appellant stated that he thought something might have been wrong but admitted that he did not see or hear anything that would justify this belief, other than the fact that appellee was leaning through the window. Appellant testified that he yelled at appellee, cursing him, and that when appellee turned around, he had a whisky bottle in his hand that he "raised towards" appellant. Appellant stated that he then grabbed a baseball bat from the back of his truck, approached the truck Ms. Lucas was sitting in, and struck the back of the truck with the bat as a warning to appellee. According to appellant, appellee was turned away from the door of the truck, facing appellant's direction, and was standing near the truck where the cab joins the bed. Appellant struck appellee several times with the baseball bat, even hitting him after he had fallen to the ground.

Appellant contended that he acted in self defense and that his actions were justified because of the circumstances surrounding the encounter. He said that from the time he first became involved with Ms. Lucas in 1997, he had received numerous threats from appellee. Further, appellant stated that when he saw appellee leaning in the truck where Ms. Lucas was sitting, he decided he ought to investigate the situation because appellee had "been known to beat on her." He admitted, however, that appellee was not beating or hurting anyone when he arrived. He further acknowledged that he could have called the police, but did not do so because he believed it would do no good.

Appellee testified that on the day of the altercation, he and his children had followed Ms. Lucas to the restaurant and that he had "tapped" the rear of her vehicle with his when they were waiting at a red light. According to appellee, after he made contact with Ms. Lucas's bumper, she leaned out her window and told him to follow her to the restaurant, where she offered to buy his dinner. He said he told her that he was not hungry but that she could take the children into the restaurant for dinner while he waited outside. He admitted to having a drink while he waited. Appellee testified that he remembered Ms. Lucas coming out of the restaurant but that he did not remember anything that

occurred after that. Appellee admitted that he and appellant had exchanged numerous threats over the course of time.

Donna Green, the proprietor of the restaurant, testified that when she came out to the parking lot to leave, she saw someone leaning into Ms. Lucas's truck, "arguing and fussing and fighting." She saw appellant get out of his truck and hit the tailgate of the truck Ms. Lucas was in with a baseball bat. She then went inside to call the police. Ms. Green testified that her vehicle was blocked in by appellee's van and appellant's truck and that the incident scared her.

Sergeant Mark Willhite testified that he was dispatched to the disturbance at the Spanish American Restaurant. At the scene, Ms. Lucas was complaining about damage to the vehicles, and the sergeant noticed what appeared to be recent damage to the front of appellee's vehicle and the back of the vehicle Ms. Lucas was driving. Appellant was not present when Sergeant Willhite arrived at the scene. The sergeant testified that appellee appeared to be intoxicated, that he was argumentative and pushy, and that he would not follow directions. Willhite said that appellee did not mention that he had been hit with a baseball bat but did say that he had been "swung at." Sergeant Willhite took appellee to the Sheriff's Department to test his blood-alcohol content, the results of which confirmed the sergeant's observation that appellee was intoxicated.

Appellant contends that the trial court wrongly applied an objective standard, that of a reasonable person or reasonable behavior, in determining that he did not act in self defense. Appellant argues that the trial court should have focused only on his perception of threatened force, not what a "reasonable man" might have done. We have reviewed the comments and ruling by the trial court and conclude that the law regarding self defense was correctly applied to this situation.

When a civil case is tried by a circuit court sitting without a jury, our inquiry on appeal is not whether there is substantial evidence to support the factual findings of the court, but whether the findings are clearly erroneous, or clearly against the preponderance of the evidence. *Springdale Winnelson Co. v. Rakes,* 337 Ark. 154, 987 S.W.2d 690 (1999). A finding is clearly erroneous when,

although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been committed. *Neal v. Matthews*, 342 Ark. 566, 30 S.W.3d 92 (2000).

■ Our research reveals a paucity of recent case law dealing with civil battery and the use of the affirmative defense of self defense in civil cases. In *Magness v. State*, 67 Ark. 594, 50 S.W. 554 (1899), the supreme court presented a thorough discussion of self defense, citing numerous authorities. In this discussion, the *Magness* court referred to *Smith v. State*, 59 Ark. 132, 26 S.W. 712 (1894), wherein the court stated that in ordinary cases of one person killing [causing physical harm to] another in self defense, it must appear that the danger was so urgent and pressing that, in order to save his own life, or to prevent his receiving great bodily injury, the killing of [physical harm caused to] the other was necessary. The court made clear that the danger must appear urgent and pressing to the person acting in self defense, not to a hypothetical reasonable man. However, to be justified in acting upon the facts as they appear to him, the actor must act with due circumspection. The *Magness* court noted that when a person is threatened with loss of life or great bodily injury, "he is compelled to act upon appearances, and determine from the circumstances surrounding him at the time as to the course he shall pursue to protect himself. When the danger is pressing and imminent . . . he is, from necessity, the judge of his own action." *Magness*, 67 Ark. 594 at 603, 50 S.W. 554 at 557. However, the court recognized a limitation on this right to judge one's own actions: the law imposes upon one the duty to act with due circumspection and without fault or carelessness on his part. *Id*.

*Magness* and *Smith* both dealt with killings rather than batteries, thus the use of the word "killing" rather than the broader term "causing physical harm to." As the dissent observes, causing physical harm is not the same as killing. There is, however, no practical difference when applying the law regarding self defense: whether one kills another or merely batters him with a baseball bat, he must have acted with due circumspection if he is to prevail on a claim of self defense.

■    In order for a person's actions to be justified as self defense, the court must find that circumstances and appearances as presented to the actor were at the time of the incident sufficient to induce in him a reasonable belief that he was in actual and imminent danger of losing his life, or suffering great bodily injury. *Id.* "Unless such was the case, it cannot be said that he acted without fault or carelessness, or that he was justified or excused. It is not sufficient, however, to justify or excuse the killing [physical harm], that the circumstances and appearances were sufficient to inspire the accused with such a belief; but the belief must also have been actually and in good faith entertained by him." *Id.*

■ ■    In *Downey v. Duff*, 106 Ark. 4, 5, 152 S.W. 1010, 1011 (1912), involving a suit for damages for assault and battery, the supreme court stated the well-settled rule that while the jury must view the transaction from the defendant's standpoint, that view must be one of good faith and free from fault or carelessness on defendant's part. "A man cannot become frenzied from any of the passions that ordinarily move men to acts of violence, and then require of the jury that they imagine their perception and judgment to be so befogged that temporarily their reasoning faculties do not control their actions." *Id.* In *Tankersley v. Fortner*, 170 Ark. 1014, 1016, 282 S.W. 354, 355 (1926), the court noted that "if one is assaulted, he may prove the aggression of his adversary, not only in mitigation of damages, but as an absolute defense, against liability for any damage, provided he used no more force in repelling the assault than appeared to him to be reasonably necessary for that purpose. This is true in a prosecution for a violation of the law as well as in a civil suit for damages." In *Garner v. Scott*, 225 Ark. 942, 286 S.W.2d 481 (1956), the court held that a jury instruction was erroneous because it permitted the defendant to be the sole judge of the method employed or the force necessary to defend himself. The court stated that the jury instruction should have read that the defendant was required to use only such means as were necessary under the circumstances to prevent harm, or acting as a reasonably prudent person, to have tried to avoid harm to himself in some other way. *Id.*

■    After reviewing the law and the various treatises cited therein, we conclude that when determining whether an action

can be justified as self defense, the fact finder must view the circumstances surrounding the accused, as they appeared to him, and then ask: (1) Did the accused believe himself to be in imminent danger? and (2) Were there circumstances that would justify such a belief in the mind of a person of ordinary firmness and reason? *See Magness, supra.*

There has been some concern that comments made by the trial judge indicated that he was in fact telling appellant that, because he was involved with appellee's ex-wife, he should just expect problems of this nature and that a reasonable man in appellant's situation should expect that he and the woman would be hunted. It appears to us that the judge was speaking of the past conduct of the parties and the circumstances that led up to the altercation. The trial judge's comments may have been ill advised, but they were in the nature of personal observations and not a statement of the law of self defense. However inappropriate some of the comments were, they did not dictate or result in a misapplication of the law regarding self defense.

█ The trial judge addressed both parties in observing that their prior conduct, the numerous threats and following each other to various locations, while not right, was "pretty normal, predictable behavior," given the fact that they were both involved with the same woman. A reading of the entirety of the judge's comments leads us to believe that, rather than affording appellee an excuse to "hunt" appellant and Tammy Lucas, the judge was considering the totality of the circumstances as to the relationship between these parties in determining whether appellant's conduct was justified. The dynamics of the relationships between these two men and Ms. Lucas certainly affected appellant's perception of the circumstances that prevailed at the time of the incident.

The judge noted that Ms. Lucas had been with appellee on an off-and-on basis for a number of years and knew how to deal with him better than did appellant. He found that appellant was the aggressor in the situation and that he had "stepped in between" Ms. Lucas and appellee. Appellant's own testimony established that appellee was not "beating or hitting" anyone when he arrived. Appellant admitted that he was already irritated about

appellee "ramming" his vehicle that Ms. Lucas was driving. Both parties had been threatening each other off and on for about eighteen months. Appellee was not the one "on a hunt" here; appellant first left the restaurant when he saw that appellee was there, then he returned and chose to intervene in the encounter between appellee and Ms. Lucas. He yelled obscenities at appellee, grabbed a bat out of his truck, approached appellee, who raised a whisky bottle toward him, struck the back of the truck appellee was standing beside to "warn him," and then struck appellee numerous times with the bat.

The judge's comments do not suggest at all that a husband has a right to hunt down and attack his wife or ex-wife. He does not suggest that Ms. Lucas was not worthy of protection. His observations reflect the reality that there was an on-going relationship of enmity between these parties; that they had all functioned thus far without the need to batter one another; that Ms. Lucas was accustomed to dealing with both appellant and appellee and, in fact, continued through the years to have personal relationships with both; and that there was nothing about the situation on December 5, 1999, that would justify appellant's thinking that Ms. Lucas suddenly needed his forceful protection. Appellant interjected himself into this situation in an aggressive manner and followed through with aggressive actions.

All of these factors support the finding by the trial court that appellant was the aggressor in the situation and not entitled to a claim of self defense. We cannot say the findings of the trial court were clearly erroneous or clearly against the preponderance of the evidence.

Appellant's second argument is that the trial court erred in its calculation of damages awarded to appellee for pain and suffering. After awarding $1,128.18 for out-of-pocket medical expenses, the trial court considered general damages for pain and suffering. The trial court first stated that four times the special damages would be appropriate. When questioned as to how he arrived at this figure, the trial judge modified the award to the sum of $5,000 for pain and suffering, plus the medical expenses.

Appellant argues that the sum of $5,000 is so disproportionate to appellee's two-week recovery time as to be unreasonable.

■ The amount of damages to be awarded for personal injuries rests largely in the discretion of the trial judge. *See Norris v. Johnson*, 214 Ark. 947, 218 S.W.2d 720 (1949). In *Matthews v. Rodgers*, 279 Ark. 328, 651 S.W.2d 453 (1983), the supreme court noted that precedents are of scant value in appeals of this kind, and that in each case we must study the proof, viewing it most favorably to the appellee, and decide the difficult question of whether the verdict is so great as to shock our conscience or to demonstrate passion or prejudice on the part of the trier of fact. After due consideration of the proof in the case before us, we cannot say that the award of damages for pain and suffering was such that it either shocked the conscience of this court or that it demonstrated passion or prejudice on the part of the trial judge.

Affirmed.

ROBBINS, NEAL and VAUGHT, JJ., agree.

PITTMAN and BAKER, JJ., dissent.

JOHN MAUZY PITTMAN, Judge, dissenting. I agree with appellant's argument that the trial judge's remarks from the bench show that he based his finding that appellant was the initial aggressor at least in part on the simple fact that appellant came into appellee's presence. I also agree that this is not the law; it is provocation and aggressive action, not mere presence, that makes one the initial aggressor. *See, e.g., Craig v. State*, 70 Ark. App. 71, 14 S.W.3d 893 (2000).

Although I believe it would be permissible for the fact finder to conclude on this record that appellant was in fact the initial aggressor, it is impossible in light of the trial judge's remarks for us to determine whether or not the finding that appellant was the initial aggressor was based on an incorrect appreciation of the law. Consequently, I would reverse and remand with directions for the trial judge to make new findings regarding initial aggression without considering appellant's mere presence as an act of aggression.

KAREN R. BAKER, Judge, dissenting. The majority concludes that a "reading of the entirety of the judge's comments leads us to believe that, rather than affording appellee an excuse to "hunt" appellant and Tammy Lucas, the judge was considering the totality of the circumstances as to the relationship between these parties in determining whether appellant's conduct was justified."

The entirety of the judge's comments reads as follows:

Okay. We're back on the record from recess. If no one has any objection, I'd like if the children to wait outside if they would, if no one has any objection.

All right. Before I give you, I'm going to feel free to say some things before I give you my final decision, because I think it might be helpful. It's not going to help anything that happened in the past, but it might be helpful as far as future dealings with each other.

But, I'm trying this case without a jury and if we had a jury here one of the instructions that I would be giving the jury is that the jury is not required to set aside their experiences, their personal experiences in life and their common knowledge and the lawyers will know that we lawyers refer to that as the common sense instruction.

And I heard all the history in this case and I really think you need to hear the history to understand these — these events don't happen in a vacuum. They happen because of other things that have happened and they explain why things happen and just using plain old common sense and of course, where we are, we're using our third brand of government, the Judiciary, which is one of our institutions. But and we're here today because the individuals basically have sought out that institution to resolve that problem. In which they have an absolute right to do that. But neither one of you individuals have demonstrated much respect for our institutions and I'm referring specifically to the institution of marriage. For one thing, living together and having these three children and then Tammy who's not here conducting herself the way she's conducted herself over the years and you taking her back and then going off and doing it again and one thing and another and exposing those children to that, it's just a matter of time before you had — we were going to have problems.

Now I have to assume she's been determined to be a common law wife, but now that would of been in September of '98

and I'm sure before you knew that she was your common law wife, before Mr. Barham — her status was probably pretty questionable. I mean, you didn't have a piece of paper and you didn't have anything to call her your wife, so to speak. But apparently you living together as husband and wife and you had three children together and were raising those three children. And then when Mr. Tygart chooses to get involved in '97, we have to assume since she's been determined to be your wife that she was your common law wife and Mr. Tygart, when you date a woman who's married to another man and has three children you can probably reasonably expect that you're going to start having some problems. You're going to start having some threats and you're going — the behavior that was described is pretty predictable behavior. A male is just going to act that way when somebody else is dating and living with a person that he considers to be his wife. . . And so you're going to have — you're going to have a problem with a man, you'd have problems — some men would of have far more problems than you had with this one.

That's been starting in '97 and the events that took place in the spring of '98 that took place, I guess that's at your home when he's looking for his wife, coming by and talking to your son, which exposes your son to your problems that ya'll have created for him and then at the bar, you know. It's not unusual when his wife's at a bar with another man that, that man's going to go hunting up his wife and he's going to hunt up the man that's with her. That's pretty normal predictable behavior. I'm not saying it's right, but I mean, it's just going to happen.

And then they are told they are married so, Kevin advises them about the common law that some Arkansas doesn't recognize. That's why I was trying to understand, [referring to the court's earlier questioning regarding the marital status of Ms. Lucas and Mr. Kohler at the time of the incident] but living in Texas and Oklahoma are states in particular I know that do recognize common law, and so they're going to undo whatever they've done and all the sudden they're using our institution. They're going through the divorce court or the Chancery Court.

Now in Chancery Court in most cases has a restraining order. Sometimes I never did hear, I don't whether that restraining order — the standing order was ever made permanent. Telling each other to stay away from each other or whatever, but the Chancery Court has a vehicle where people can go into Court if they are bothered by someone after the marriage. There's a mechanism to deal with that just like there's a mecha-

nism to deal with child support, visitation, custody, and all of those things. But they were ignoring that the cause they were going back and forth with each other so they were not looking to the Court system to resolve their problems.

But it becomes important in this way, if Tammy Lucas was having problems with him she had a way to do that. She could of gone to Mr. Barham and filed a motion to get a restraining order. She also could have gone to the Prosecuting Attorney's office if he was harassing her and of course that would of been a condition of her staying away from him. I mean, you can't keep going around someone and then complain that they're bothering you. So she wasn't looking for that kind of help obviously. She still was going to go back and forth and according to the testimony that continued even after — up to and after this event. Likewise you have a mechanism, there's — you can go to the prosecuting attorney's office and seek a warrant for harassing communications, terroristic threatening, there's all types of things that y'all could of done to resolve this problem and avoid it.

What's most troubling to this Court is the way that y'all have dealt with these children. I mean, that is not really before me, but in a sense I've heard it and I can't help but have an opinion about it. But for you to expose these young children to this kind of behavior is one of the most unacceptable things about this whole thing I've heard. For them to be ten years old and have to deal with this is just — it's just not right. There's nothing about it that's right.

Now, I'm going to get up to the incident, of course what we're talking about is reasonable behavior. How a reasonable person would conduct themselves. What they should do and shouldn't do under all the circumstances, and I'm including all the circumstances that we heard here. Tammy obviously knew how to deal with the problem with Mr. Kohler. They — I mean, I imagine based on what I heard, they probably had problems all the time. If I knew that and I saw them fussing and arguing I would figure Tammy can handle her own problems and stay away from it. I would not get in the middle. I would certainly not run to this woman's defense considering the behavior that she's engaged in. Certainly wouldn't run in here to protect her that's for sure. I mean, I don't know what you're protecting her from. She knew how to deal with this man better than you do. When you get involved with him and step in between him and her, all you're going to have is a problem, which is exactly what you've got.

Now, if you were concerned about her safety, there are many things that you could of done. You could of simply gone into the restaurant and joined Mrs. Green and called the police. A lot of things you could — I can't tell anything that was going on that was an emergency. It may very well be that you were interested in the conversation and that he had — his interests were at odds with your interests or that he had a conflict with your interests, but we don't resolve those problems with a baseball bat. But I mean, if you were really, really genuinely concerned that he was going to hurt her or do something to her, there's a lot of ways to do that. But again, she — with the years that she's had with him and the make ups and break ups they've gone through, there's no reason to run and step in between them and in this particular case the facts — I mean, it's clear based on your own testimony, it's not anybody else's, your own testimony, you drove up, choose to get involved in this situation because of something you anticipated might happen or was going to happen and took a baseball bat to prevent it and you, in my opinion in this case you were the aggressor in this particular case. Even if he had the bottle in, and there's some dispute about that, that is no reason — there's not any testimony or anything that would justify taking a baseball bat, and in fact, just going in and stepping into the situation is not reasonable behavior under all the circumstances that I heard.

So I'm finding in favor of the Plaintiff on the Plaintiff's complaint. I think you were the aggressor and engaged in a literal battery. Now, the issues of damages . . . [colloquy court and counsel regarding damages] . . . .

I will end it by saying this, I wish both you gentlemen would, in the future, would give a little more thought and priority to your children before you bring an individual like that [referring to the ex-wife and mother of Mr. Kohler's children] around your home and expose your children to the problems you've exposed them to and that is a great concern to the Court. Now, that's true of both of you. I think you're both guilty of that. Okay. Thank you very much. I appreciate you.

The following colloquy also occurred between the court and Mr. Tygart's counsel, Mr. Barham, after counsel attempted to elicit testimony regarding previous threats made by Mr. Kohler to Mr. Tygart:

| | |
|---|---|
| COURT: | I've heard the history on all this and I understand it now. I think I need to, but what's the relevance of this testimony as — |
| MR. BARHAM: | Because your Honor, there are specific threats made at this particular time and those threats were communicated to Mr. Tygart, . . . and it goes to show his state of mind and his weariness, what he had going on, and that's part of the defense of self-defense. |
| COURT: | Well, what's going on is these two individuals were married at that point and time. That's — I mean that's what's going on. Mr. Kohler was married to the person we're calling Tammy. In the spring of '98, they weren't divorced yet. |

As the judge explained, he used his common sense regarding the relationship of a man and his wife in evaluating the case before him. He found that the woman was not conducting herself the way she should have as a wife, and the natural consequence of this was that the husband was going to go "hunt" his wife and the man with her. He found that the wife had experience dealing with Mr. Kohler's combative behavior through her entire relationship with him, but that she obviously wasn't looking for protection from his harassing behavior or she would have done something to resolve the problem. He found that Mr. Tygart had stepped between Mr. Kohler and Ms. Lucas to protect Ms. Lucas from Mr. Kohler; however, the court found that this protection was unreasonable because she was not worthy of protection.[1] In his words:

> I would not get in the middle. I would certainly not run to this woman's defense considering the behavior she's engaged in. Certainly wouldn't run in here to protect her that's for sure. I mean, I don't know what you're protecting her from. She knew how to deal with this man better than you do. When you get

---

[1] For a general discussion of how deep-rooted societal biases hamper self-defense claims of battered women, and the judiciary's role in addressing the problem, see Reva B. Siegel, *"The Rule of Love" Wife Beating as Prerogative and Privacy*, 105 YALE L.J. 2117 (1996); Laura Huber Martin, *Ohio Joins the Majority and Allows Expert Testimony on the Battered Woman Syndrome*, 60 U. CIN. L. REV. 877 (1992); Paige Bigelow, *Guilty of Survival: State v. Strieby and Battered Women Who Kill in Utah*, 1992 UTAH L. REV. 979.

involved with him and step in between him and her, all you're going to have is a problem, which is exactly what you've got.

Nothing in the judge's comments directly references the testimony of the police officer who investigated the December 5, 1998, incident that is the subject of the lawsuit or the testimony of the restaurant owner. However, their testimony certainly supports the court's findings that Mr. Tygart was stepping in between Mr. Kohler and Ms. Lucas to protect Ms. Lucas.

The police officer testified that when he arrived at the scene, Mr. Kohler had a strong odor of intoxicants about his person. He was unsteady on his feet, very argumentative, and aggressive. The officer further testified that he was trying to keep Mr. Kohler away from Ms. Lucas. Mr. Kohler would continually come over to Ms. Lucas who appeared to be frightened and afraid of him as he continued to push his way around the officer. The officer repeatedly asked Mr. Kohler to quiet down because he was screaming, yelling, and cussing. Mr. Kohler refused to follow the officer's directions and would not calm down, and the officer finally placed him into the police unit so that the officer could talk to Ms. Lucas. Because of Mr. Kohler's obvious intoxication and belligerence, the officer took him into custody. At the police station, he administered a breathalyser test. Mr. Kohler registered .14%. Mr. Kohler did not appear to be injured at the scene and made no statements to the officer that he had been hit. The officer also confirmed that the two vehicles had been recently damaged, that it appeared that Mr. Kohler's vehicle had struck Ms. Lucas's truck and that Mr. Kohler's vehicle appeared to have been blocking Ms. Lucas's vehicle.

The owner of the restaurant testified that she left the restaurant right after Ms. Lucas and her three children. She testified that Ms. Lucas and her children were in the vehicle parked next to her behind the restaurant and that she couldn't leave because Mr. Kohler had her car and Ms. Lucas's truck blocked in. While inside her vehicle, she heard Mr. Kohler yelling profanity and other "ugly things." She characterized Mr. Kohler as combative and belligerent and stated that his presence scared her. She witnessed Mr. Tygart drive up, get out with the bat, and hit the tailgate of Ms. Lucas's truck with the bat. Then, she ran inside to call the police.

Mr. Tygart testified that the first time he had contact with Mr. Kohler, that Mr. Kohler threatened to shoot him, that he had made police reports concerning Mr. Kohler's conduct toward him between May 1997 and to the end of December of 1998. Mr. Tygart estimated that Mr. Kohler had made fifty to sixty phone calls to Mr. Tygart prior to the December incident. He estimated that the number of phone calls and "drive-bys" had increased to three hundred up to the date of trial. He explained that he hit the tailgate of the truck Ms. Lucas was in as a warning to Mr. Kohler, but that it did not stop him, and that Mr. Kohler turned toward him with a whiskey bottle in his hand.

Mr. Kohler's testimony was completed devoid of any details of the incident. His memory was limited to recalling that he had only one drink from the whiskey bottle with him in his vehicle, but he wasn't so drunk that it would affect his memory, so his inability to recall any details of the encounter itself must have been from a blow to the head. He also recalled awaking in a jail cell the next morning and asking what had happened, and if the police there beat people up.

While the judge's finding that Mr. Tygart was stepping in between Mr. Kohler and Ms. Lucas to protect Ms. Lucas is supported by the evidence, his conclusion that Mr. Tygart became the aggressor when he came to her defense has no basis in the law.

First, self-defense is a bona fide defense to a civil action for assault and battery. *Bergmen v. Maberry*, 228 Ark. 597, 599, 309 S.W.2d 305, 306 (1958); *Downey v. Duff*, 106 Ark. 4, 152 S.W. 1010 (1912). Second, a person is legally justified to use physical force to defend himself or another person. *See* Ark. Code Ann. § 5-2-606 (a) (Repl. 1997) (noting that a person is justified in using physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he may use a degree of force that he reasonably believes to be necessary; however, he may not use deadly physical force except as provided in § 5-2-607); *Brockwell v. State*, 260 Ark. 807, 815, 545 S.W.2d 60, 66 (1976) (holding every fact that would be competent evidence in a case of self-defense by the person defended is competent where the killing by the accused is alleged to be in defense of another.)

The fact that the person Mr. Tygart was defending was the wife of the aggressor provides no legal basis for denying Mr. Tygart the protection of the law. Nor does the fact that Mr. Tygart was romantically involved with the aggressor's wife in any way justify Mr. Kohler's actions toward Ms. Lucas. *See Flowers v. State*, 152 Ark. 295, 238 S.W. 37 (1922) (the fact that deceased made indecent proposals to appellant's wife, or that appellant received information that he had done so, afforded no excuse or justification for the homicide); *Fisher v. State*, 149 Ark. 48, 231 S.W. 181, (1921) (the fact of intimacy between appellant's wife and the assaulted person and appellant's receiving information thereof did not constitute a justification in law for the assault).

Eighty-three years ago, our supreme court soundly rejected the idea that men were somehow justified in hunting down seducers of their women. In denouncing a prosecutor's closing remarks to a jury that had been described as "impassioned," the court said:

> They are all this and more; they were inflammatory. They purported to state as a fact that the law in Mississippi permitted relatives of young women who had been seduced to take shotguns and go out and kill the seducer. Such is not the law in Mississippi, nor in any other state of the Union, nor in any civilized country.

*Doran v. State*, 141 Ark. 442, 447, 217 S.W. 485, 488-87 (1920).

Not only is the majority opinion wrong in the application of our existing case law, they change the law completely. The majority cites *Magness v. State*, 67 Ark. 594, 50 S.W. 554 (1899) and *Smith v. State*, 59 Ark. 132, 26 S.W. 712 (1894) for the proposition that "in ordinary cases of one person killing [causing physical harm to] another in self defense, it must appear that the danger was so urgent and pressing that, in order to save his own life, or to prevent his receiving great bodily injury, the killing of [physical harm caused to] the other was necessary." The majority combines the concepts of "causing physical harm to" and "physical harm caused to" with our existing case law regarding the justification of "killing" another person in self-defense. Causing physical harm is not the same as killing. In the criminal context, this distinction is statutorily recognized and codified. One code section explains that

> [a] person is justified in using physical force upon another person to defend himself or a third person from what he reasonably

believes to be the use or imminent use of unlawful physical force by that other person, and he may use a degree of force that he reasonably believes to be necessary. . . .

Ark. Code Ann. § 5-2-607 (Repl. 1997); *see also Britt v. State*, 7 Ark.App. 156, 645 S.W.2d 699 (1983) (holding that the defense of justification in the use of physical force requires both that the actor reasonably believes that unlawful physical force is about to be used upon him and that he reasonably believes that the degree of force used to repel it was necessary).

"'Physical force' means any bodily impact, restraint, or confinement, or the threat thereof." Ark. Code Ann. § 5-2-601(3) (Repl. 1997). "'Unlawful physical force' means physical force that is employed without the consent of the person against whom it is directed and the employment of which constitutes a criminal offense or tort or would constitute such an offense or tort except for a defense of justification or privilege." Ark. Code Ann. § 5-2-601(4) (Repl. 1997). "'Physical injury' means the: (A) Impairment of physical condition; (B) Infliction of substantial pain; or (C) Infliction of bruising, swelling, or visible marks associated with physical trauma." Ark. Code Ann. § 5-1-102(14) (Supp. 2001). "'Deadly physical force' means physical force that under the circumstances in which it is used is readily capable of causing death or serious physical injury." Ark. Code Ann. § 5-2-601(5) (Repl. 1997). There is a practical difference between killing another and causing another physical injury. There is also a practical, and legally required, difference in the analysis.

The majority's standard requires that before a person is entitled to use any physical force it must appear that the person is in danger of losing his own life or in danger of receiving great bodily injury. That standard only applies in limiting the use of deadly force:

(a) A person is justified in using deadly physical force upon another person if he reasonably believes that the other person is:

(1) Committing or about to commit a felony involving force or violence;

(2) Using or about to use unlawful deadly physical force; or

(3) Imminently endangering his or her life or imminently about to victimize a person as described in § 9-15-103(a)(2), from the continuation of a pattern of domestic abuse. For the purposes of this section "domestic abuse" shall be that described in § 9-15-103(a).

Ark. Code Ann. § 5-2-607 (Repl. 1997).

Under the majority's new standard, Arkansas becomes the only jurisdiction in the United States where a man defending a woman from her husband is liable for damages sustained by the husband when he is prevented from completing his attack upon the woman. It is unacceptable, and until today, it was not the law.

I dissent.